IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

BELKNAP HOLDINGS, LLC, f/k/a )
PROTOCAM LLC & RONALD L. )
BELKNAP, )
                    )
           Plaintiffs, )   C.A. No. N23C-10-199 EMD CCLD
                    )
           v. )
                    )
MIDWEST PROTOTYPING, LLC )
                    )
           Defendant. )

Submitted: July 24, 2024
Decided: October 8, 2024

*Upon Defendant's Motion for Summary Judgment*
**GRANTED**
*Upon Plaintiffs' Motion for Judgment on the Pleadings*
**DENIED**

Sarah E. Delia, Esquire, McCarter & English, LLP, Wilmington Delaware. *Attorney for Plaintiffs Belknap Holdings, LLC and Ronald L. Belknap.*

Taylor A. Christensen, Esquire, John P. DiTomo, Esquire, Morris Nichols Arsht & Tunnell, LLP, Wilmington Delaware. *Attorneys for Defendant Midwest Prototyping, LLC.*

**DAVIS, J.**

## I.     INTRODUCTION

This is a civil action assigned to the Complex Commercial Litigation Division of the Court. Plaintiffs, Belknap Holdings, LLC f/k/a Protocam LLC ("Holdings" or "Seller") and Ronald L. Belknap[1] seek a declaratory judgment against Defendant, Midwest Prototyping, LLC ("Midwest" or "Buyer").[2] Specifically, Belknap seeks a declaration regarding certain disputed

---

[1] Belknap Holdings, LLC and Mr. Belknap will be collectively referred to as "Belknap."
[2] *See* Complaint ("Compl.") (D.I. No. 1).

terms in the parties' Asset Purchase Agreement ("APA"), and a direction to the Resolution Account (defined below) to apply the declaration as to those terms when resolving a dispute under the APA.[3]

The parties have filed two dispositive motions: (i) Belknap's Motion for Judgment on the Pleadings (the "Belknap Motion")[4] filed on January 29, 2024; and (ii) Midwest's Motion for Summary Judgment (the "Midwest Motion")[5] filed on March 12, 2024 (collectively, the "Motions").  The Court held a hearing on the Motions on July 24, 2024.[6]  At the conclusion of the hearing, the Court took the Motions under advisement.[7]

For the reasons stated below, the Court **GRANTS** the Midwest Motion and **DENIES** the Belknap Motion.

## II.     RELEVANT FACTS

### A.  THE PARTIES.

Mr. Belknap is the principal of Holdings.[8]  Holdings is a Pennsylvania LLC with its principal place of business in Pennsylvania.[9]  Holdings was formed in 2013 and is an additive manufacturing company.[10]

Midwest is a Wisconsin limited liability corporation with its principal place of business in Wisconsin.[11]  Midwest is also an additive manufacturing company.[12]

---

[3] Compl. at 12-13.
[4] Plaintiffs' Motion for Judgment on the Pleadings ("Pls.' Mot. for J. on the Pleadings") (D.I. No. 14).
[5] Defendant's Combined Answering Brief in Opposition to Plaintiffs' Motion for Judgment on the Pleadings and Opening Brief in Support of its Motion for Summary Judgment ("Def.'s Combined Br.") (D.I. No. 20).
[6] D.I. 31.
[7] *Id.*
[8] Compl. ¶ 1.
[9] Id. ¶¶ 2-3
[10] *Id.* ¶ 6.
[11] *Id.* ¶ 4.
[12] *Id.* ¶ 7.

2

**B. THE ASSET PURCHASE AGREEMENT.**

On May 27, 2022, Belknap and Midwest entered into the APA.[13] Through the APA, Midwest purchased all of Belknap's rights, title, and interest in all assets and property of every kind used in Belknap's business, other than excluded assets.[14] The APA included an Earnout Provision.[15]

### 1. The Earnout Provision.

The Earnout Provision requires Midwest to pay Belknap an additional monetary amount if Belknap's "Qualifying Revenue" for 2022 exceeded specific thresholds.[16] The "First Revenue Threshold" required Qualifying Revenue to exceed $4.5 million.[17] The "Second Revenue Threshold" required Qualifying Revenue to exceed $5 million.[18]

"Qualifying Revenue" is:

[T]he revenue of the Business on sales made solely to Qualifying Customers, provided that such sales to Qualifying Customers are made in the Ordinary Course of Business including at prices and margins consistent with past practice.[19]

"Qualifying Customers" are defined as:

[T]hose customers of the Business that are sourced, whether before or after Closing Date, solely through the Business Employees, and not through Buyer or any of its Affiliates; provided, however, that after the Closing Date any customers sourced solely through (a) the Transferred Employees or (b) personnel of the Business hired after the Closing Date to perform services solely for the Business and not for any other business of Buyer or its Affiliates, shall be deemed to have been sourced

---

[13] *Id.* ¶ 8.

[14] *Id.*

[15] *Id.* ¶ 9. Compl., Ex. A ("APA") at § 3.4.

[16] Compl. ¶ 10. The Earnout Provision states: "As an additional component to the Purchase Price, the Seller will be eligible to receive the Earnout Amount based on Qualifying Revenue (as defined below) meeting or exceeding the applicable Revenue Threshold during the calendar year 2022 period (the "Earnout Period"). APA § 3.4.

[17] APA § 3.4(a)(ii) ("'First Revenue Threshold' means $4,500,000, constituting the Qualifying Revenue for the 12-month period ended December 31, 2022 and reflected on Exhibit 3.4(a)(ii) attached hereto."). The threshold is capped at $5 million.

[18] APA § 3.4(a)(vi) ("'Second Revenue Threshold' means $5,000,000, constituting the Qualifying Revenue for the 12-month period ended December 31, 2022 and reflected on Exhibit 3.4(a)(ii) attached hereto.").

[19] APA § 3.4 (a)(v). Article 1 of the APA contains a list of definitions, "Ordinary Course of Business" is defined as "any action taken that is consistent in nature, scope and magnitude with the past practices of the Seller and is taken in the ordinary course of the normal, day-to-day operations of the Seller." APA at 6.

through Seller and shall be included as Qualifying Customers; provided further, however, Buyer and its Affiliates shall be included as Qualifying Customers with respect to all revenue paid to or accrued to Seller prior to the Closing Date (but not on or after the Closing Date).[20]

### 2. *Disagreement regarding Earnout Amount.*

Under the APA, Midwest would prepare and deliver a statement (the "Revenue Statement") setting forth its good faith calculations of the Qualifying Revenue and the corresponding Incremental Revenue during the Earnout Period.[21] The APA provides that Belknap could deliver a written "Disagreement Notice" to Midwest if Belknap disputed the Revenue Statement.[22] The Disagreement Notice needed to provide detailed descriptions of the disputes (the "Disagreements").[23]

On March 31, 2023, Midwest provided the Revenue Statement to Belknap.[24] In response, Belknap sent a Disagreement Notice.[25] In its Disagreement Notice, Belknap identified five Disagreements with the Revenue Statement.[26] Two seemed to have been resolved as only three remain as of the filing of the Complaint.

First, Belknap contends that the Revenue Statement excluded revenue in the amount of $39,496.50 related to work for Avkin (the "Avkin Sale") that was performed in 2022 but was not delivered until January 2023 at the request of Avkin.[27] Belknap maintains that it sent the invoice

---

[20] APA § 3.4 (a)(iv) (emphasis in original).

[21] Compl. ¶ 18; APA § 3.4(b).

[22] APA § 3.4(b) ("If the Seller Parties disagree with the calculation of the Qualifying Revenue or the Incremental Revenue, the Seller Parties must deliver to Buyer a written Disagreement Notice within the Disagreement Period setting forth, in reasonable detail, each Disagreement."). The APA also stated that anything not objected to in the Disagreement Notice is deemed accepted by the seller. *Id.*

[23] APA § 3.4(b) ("If the Seller Parties disagree with the calculation of the Qualifying Revenue or the Incremental Revenue, the Seller Parties must deliver to Buyer a written Disagreement Notice within the Disagreement Period setting forth, in reasonable detail, each Disagreement."). The APA also stated that anything not objected to in the Disagreement Notice is deemed accepted by the seller. *Id.*

[24] Compl. ¶ 19. Midwest sent a revised statement via email on April 3, 2023. *Id.* The March 31st statement is attached as Exhibit B to the Complaint.

[25] *Id.* ¶ 20. Compl., Ex. C ("Seller's Disagreement Notice").

[26] *See* Seller's Disagreement Notice.

[27] Compl. ¶ 21.

for the Avkin Sale on December 27, 2022, and that the sale was made in 2022. As such, Belknap claims that the Avkin Sale occurred during the Earnout Period and should have been included in the Revenue Statement.[28]

Second, Belknap disputes the disqualification of $295,149 of revenue from Xometry, claiming that Midwest misclassified Xometry as a Non-Qualifying Customer.[29] Belknap contends that Belknap sourced this sale (the "Xometry Sale"), and was solicited and accepted through a portal that Belknap had established with Xometry prior to the execution of the APA.[30] Midwest excluded the Xometry Sale from the Revenue Statement because Midwest found the sale was not sourced solely by Belknap.[31]

Third, Belknap challenges Midwest's designation of "Booked Revenue" as non-Qualifying Revenue.[32] Midwest deducted $116,145 in Booked Revenue from the Revenue Statement as a prepayment and not revenue.[33]

The APA provides a dispute resolution process (the "Resolution Accountants Provision") involving qualified accountants (the "Resolution Accountants").[34] Instead of submitting the Disagreements to the Resolution Accountants, however, Belknap filed this lawsuit. Belknap contends that the dispute resolution provision does not apply to "legal questions of contractual interpretation and construction."[35]

---

[28] *Id.* ¶ 22; Seller's Disagreement Notice ¶ 1.
[29] Compl. ¶ 24; Seller's Disagreement Notice ¶ 2. Belknap argues that Xometry has been a customer since 2017. Compl. ¶ 24.
[30] Compl. ¶ 25.
[31] *Id.* ¶ 26.
[32] *Id.* ¶ 30; Seller's Disagreement Notice ¶ 5.
[33] Compl. ¶ 28.
[34] *Id.* ¶ 31. APA § 3.4(c) ("If, after a period of 30 days following the date on which the Disagreement Notice is delivered, the Seller Parties and Buyer have not resolved all Disagreements, then the remaining Disagreements will be submitted to the Resolution Accountants.").
[35] Compl. ¶ 32.

## C. THE CURRENT LITIGATION.

Belknap filed suit on October 25, 2023, seeking a declaration as to the legal interpretation of the terms "Sourced" and "Sales Made" as used in the parties' APA.[36] Belknap also asks that the Court "direct" the Resolution Accountants to apply any declaration regarding Sourced and Sales Made in resolving Disagreements.[37] Midwest filed its Answer on December 18, 2023, and denied substantially of the claims made by Belknap, and asserted three affirmative defenses.[38]

On January 19, 2024, Belknap filed the Belknap Motion. On March 12, 2024, Midwest filed the Midwest Motion asserting that the Resolution Accountants Provision controls the instant matter.[39] Midwest argues that the entirety of Belknap's claims are covered by the Resolution Accountants Provision in the parties' APA, and the case should be dismissed pursuant to Civil Rule 12(b)(1) in favor of the APA's Resolution Accountants Provision process.[40] In response, Belknap filed a Combined Brief in Opposition to Midwest's Motion and in support of its own Motion for Judgment on the Pleadings on April 12, 2024.[41] Midwest then filed its Reply Brief in support of its Motion on April 30, 2024.[42] The Court heard oral argument on July 24, 2024. At the conclusion of the hearing, the Court took the Motions under advisement.[43]

---

[36] *Id.* ¶ 1.
[37] *Id.* at 13.
[38] *See generally* Answer (hereinafter "Ans.") (D.I. 10).
[39] Defendant's Combined Answering Brief in Opposition to Plaintiffs' Motion for Judgment on the Pleadings and Opening Brief in Support of its Motion for Summary Judgment ("Def.'s Combined Br.") (D.I. No. 20).
[40] *See generally* Def.'s Combined Br.
[41] Plaintiffs' Combined Reply Brief in Support of their Motion for Judgment on the Pleadings and Answering Brief in Opposition to Defendant's Motion for Summary Judgment ("Pls.' Combined Br.") (D.I. 25).
[42] Defendant's Reply Brief in Support of its Motion for Summary Judgment ("Def.'s Reply Br.") (D.I. 26).
[43] D.I. No. 31.

## III. STANDARD OF REVIEW

Upon a motion for judgment on the pleadings, "the Court considers all pleadings, including the complaints, answers, 'documents integral to the pleadings,' such as those attached as exhibits or incorporated by reference, and facts subject to judicial notice."[44] The Court will grant a motion for judgment on the pleadings "when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[45]

A motion for summary judgment will be granted when "after viewing the record in a light most favorable to a nonmoving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law."[46] The Court, in considering a motion for summary judgment, "examine[s] the record to determine whether genuine issues of material fact exist, 'but not to decide such issues.'"[47] The moving party bears the burden of proving his claim is supported by undisputed facts, if the motion is properly supported, then the burden shifts to the non-moving party to demonstrate any material issues of fact.[48]

"These well-established standards and rules equally apply [to the extent] the parties have filed cross-motions for summary judgment."[49] "Where cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, 'the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.'"[50]

---

[44] *D'Antonio v. Wesley College, Inc.*, 2023 WL 9021767, at *2 (Del. Super. Dec. 29, 2023).
[45] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).
[46] *Celgene Corp. v. Humana Pharmacy, Inc.*, 2023 WL 3944029, at *5 (Del. Super. May 31, 2023).
[47] *Genworth Fin., Inc. v. AIG Specialty Ins. Co.*, 2023 WL 6160426, at *8 (Del. Super. Sept. 21, 2023).
[48] *Celgene Corp.*, 2023 WL 3944029, at *5.
[49] *Genworth Fin., Inc. v. AIG Specialty Ins. Co.*, 2023 WL 6160426, at *8.
[50] *Id.*

## IV. DISCUSSION

The Court holds that this dispute and Belknap's claims fall within the Resolution Accountants Provision in the APA. Moreover, the Court holds that the Disagreements can be resolved by the Resolution Accountants without intervention or definition by the Court. As such, the Resolution Accountants Provision is the appropriate mechanism for resolving the Disagreements. The Court, therefore, will **GRANT** the Midwest Motion and **DENY** the Belknap Motion.

Midwest provided Belknap with the Revenue Statement and its calculations during the Earnout Period.[51] In response, Belknap sent its Disagreement Notice to Midwest and the parties began trying to resolve those Disagreements.[52] The APA provides that if the parties were unable to resolve those disagreements within 30 days, the remaining Disagreements should have been submitted to the Resolution Accountants. The factual record demonstrates that the parties did not submit the remaining Disagreements to the Resolution Accountants.[53]

Midwest contends that the three Disagreements asserted in the Complaint center around accounting and defining revenue.[54] Midwest characterizes this accounting and defining revenue process as "obviously within the Resolution Accountants' expertise."[55] Midwest argues that the Court should defer to the Resolution Accountants Provision.

In support, Midwest relies on *Specialty Dx Holdings, LLC v. Lab'y Corp. of Am. Holdings*.[56] In *Specialty Dx Holdings, LLC*, the Court analyzed a similar provision, found it to be narrow in scope, and held that because it was narrow in scope, that signified that the parties

---

[51] Compl., Ex. B (hereinafter "Revenue Statement").
[52] Seller's Disagreement Notice.
[53] *See* APA § 3.4(c).
[54] Def.'s Combined Br. at 25.
[55] *Id*.
[56] *Specialty Dx Holdings, LLC v. Lab'y Corp. of Am. Holdings*, 2020 WL 5088077, at *6 (Del. Super. Jan. 31, 2020).

had agreed to arbitrate disputes regarding earnout calculations.[57] The provision in *Specialty Dx Holdings* stated:

> The independent accounting firm shall (i) address only the items in the Dispute Notice ("Disputed Items") or other manifest errors discovered by the independent accounting firm, and (ii) re-calculate the First Earnout Statement or Second Earnout Statement, as applicable and determine if Purchaser complied with the covenants contained herein.[58]

The Court noted that "[a]n independent accounting firm is well-placed to resolve a dispute about differing calculations of revenue, which will then be used to calculate an earn-out statement."[59] The Court in *Specialty Dx Holdings* also held that "the fact that the Adjustment Amount may require the accounting firm to make a legal interpretation does not prevent the parties from engaging an accounting firm."[60]

Belknap, in its Opposition, agrees that the arbitration provision here is a narrow one and that the parties are bound to submit their disagreements to the Resolution Accountants.[61] However, Belknap argues that, because the suit seeks a declaration as to the "legal definitions" of terms, the Court should resolve the dispute.[62] Belknap posits that the Resolution Accountants Provision is more akin to an expert determination and the disputes fall outside that expert's scope.

Belknap relies on *Terrell v. Kiromic Biopharma, Inc.*[63] The Supreme Court in *Terrell* noted, that "under Court of Chancery precedent, where an ADR provision contemplates a process other than arbitration, such as when the parties have entrusted a discrete decision to an expert, thus earning the label 'expert determination,' the court applies contract interpretation

---

[57] *Id.*
[58] *Id.*
[59] *Id.* at *7.
[60] *Id.* at *8.
[61] *See* Pls.' Combined Br. at 10.
[62] *See id.* at 13.
[63] 297 A.3d 610 (Del. 2023).

9

principles to determine the ADR provision's scope."[64]  Belknap maintains that this dispute falls

into the latter, and the Court should apply contract interpretation principles to determine the

ADR provision's scope.  In *Terrell*, the Court found the following provision to be one for expert

determination:

> Any dispute regarding the interpretation of this agreement shall be submitted by Optionee or the Company to the Committee for review.  The resolution of such a dispute by the Committee shall be final and binding on the Company and Optionee.[65]

The *Terrell* Court placed importance on whether the provision lacks procedural rules that

would afford "each side the opportunity to present their case" which is a "defining

characteristic of arbitration provisions."[66]

The Court observes that in *Archkey Intermediate Holdings Inc.*,[67] the Court of Chancery

found that there are two ends of the ADR Spectrum.

> At one end is an arbitration that has the look and feel of a judicial proceeding, except that it is handled privately and with less formality.  At the other end is an expert determination in which an expert with technical skills or knowledge makes a determination, largely on its own, and with only limited party input.[68]

The Court of Chancery classified a provision as an expert determination when it "provides

parties with a quick and relatively inexpensive answer on an issue that calls for informed

judgment."[69]  In *Archkey*, the Court of Chancery held that "if a dispute over timely notice turns

on reviewing correspondence between the parties and analyzing legal issues like waiver or

estoppel, then the inquiry likely goes beyond what the parties intended for the independent

---

[64] *Id*. at 617.

[65] *Id.*

[66] *Id*. at 618-19.

[67] 302 A.3d 975 (Del. Ch. 2023).

[68] *Id*. at 989.

[69] *Id*. at 990.  In *Archkey*, the court also found that a provision could also be classified as an Accountant True-up Mechanism and went on to describe the typical characteristics of an Accountant True-up Mechanism.  *See id.* at 991. The court held that for Accountant True-up Mechanisms, the "principles of contract interpretation determine whether a disputed issue falls within its scope." *Id*. at 997.

10

accountant to resolve."[70]  But, the Court of Chancery also stated that "[a] court need not construe every word in a provision calling for an expert determination before the expert can do its work."[71]  "The more closely related the term or provision is to the expert's area of expertise, the more likely it is that an expert can interpret the term without judicial assistance."[72]

Delaware courts do not have subject matter jurisdiction to hear claims that litigants have agreed to arbitrate.[73]  The Court will dismiss an action for lack of subject matter jurisdiction if, on its face, the dispute falls within an arbitration clause.[74]  Additionally, "[t]here is a strong presumption in favor of arbitration."[75]  To determine if a dispute is subject to arbitration, the Court engages in a two-part inquiry:[76]

> First, the Court must determine whether the arbitration clause is broad or narrow in scope.  Second, the Court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration.[77]

If the Court is evaluating a narrow arbitration clause, the Court will ask "if the cause of action pursued directly relates to the right in the contract."[78]  If the clause is broad, "the Court will defer to arbitration on any issues that touch on contract rights or contract performance."[79]  "An arbitration clause is narrow if arbitration is limited to specific types of disputes."[80]

The Court finds that the Resolution Accountants Provision in the APA is a narrow clause as it only refers to matters concerning the Disagreement Notices.  The Court need not determine

---

[70] *Id.* at 993.
[71] *Id.* at 997.
[72] *Id.* at 998.  The court in *Archkey* determined that the issue of what constitutes "past practice" is well within an accountant's expertise.  *Id.*
[73] *Specialty Dx Holdings, LLC*, 2020 WL 5088077, at *5.
[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.* at *6.

whether the provision is a classic arbitration clause or one for expert determination because the

result is the same here—the APA designates that Disagreements should ultimately be resolved

by the Resolution Accountants. The relevant portion of APA provides:

> If, after a period of 30 days following the date on which the Disagreement Notice is delivered, the Seller Parties and Buyer have not resolved all Disagreements, then the **remaining Disagreements will be submitted to the Resolution Accountants**. Buyer will grant to the Resolution Accountants reasonable access, during regular business hours and upon reasonable advance notice, to the Business's books and records, and each Party shall grant to the Resolution Accountants reasonable access to such Party's work papers . . . The Parties shall also instruct the Resolution Accountants to (i) limit the scope of their review to only the unresolved Disagreements, (ii) make their determination based solely on written submissions by the Buyer and the Seller Parties which are in accordance with the guidelines and procedures set forth in this Agreement (i.e., not on the basis of an independent review) and (iii) include in their final report the Resolution Accountants' reasoning in reaching their determinations . . .[81]

Disagreement is defined in the APA as "disagreement by the Seller regarding the

calculation of (a) the PP Components set forth in Buyer's Closing Statement or (b) the

Incremental Revenue set forth in Buyer's Revenue Statement, as the case may be."[82]

Incremental Revenue is defined as "for the Earnout Period, any amount, if any, by which

the Qualifying Revenue during the Earnout Period exceeds the applicable Revenue Threshold."[83]

Qualifying Revenue is defined as "the revenue of the Business on sales made solely to

Qualifying Customers, provided that such sales to Qualifying Customers are made in the

Ordinary Course of Business including at prices and margins consistent with past practice."[84]

Belknap ask the Court to render a decision that is unnecessary. The Resolution

Accountants are perfectly capable of determining whether revenue of a business should be

---

[81] APA § 3.4 (c) (emphasis added).
[82] *Id.* at 2.
[83] APA § 3.4 (a)(iii).
[84] *Id.* § 3.4 (a)(v).

Qualifying Revenue of not.[85]  It is well within a Resolution Accountants' expertise to determine what qualifies as Qualifying Revenue and who counts as a Qualifying Customer.[86]  Belknap has made its objections clear in its Disagreement Notice and, in accordance with the APA, the Resolution Accountants are best positioned to decide those Disagreements.[87]

Belknap argues that the relief sought from the Court is outside the scope of the APA and the Resolution Accountant because the Resolution Accountants does not have the "authority to make binding decisions on issues of law or legal claims."[88]  Belknap relies on three cases to make this argument.

The first is *Chicago Bridge & Iron Company N.V. v. Westinghouse Electric Company, LLC*.[89]  The provision at issue in *Chicago Bridge* stated that the independent auditor was "to base its conclusions solely on written submissions from Chicago Bridge and Westinghouse, had thirty days to make its conclusion, and that conclusion was to come in the form of a 'brief written statement.'"[90]  The lawsuit in *Chicago Bridge* concerned what claims or disputes could be brought before the independent auditor.  The parties disputed whether the disagreements concerned the calculation of net working capital or were instead breaches of representations that had been expressly terminated by a liability bar in the contract.[91]  The *Chicago Bridge* court found that because the actual challenge was one touching a breach of the agreement's warranties,

---

[85] The Resolution Accountant can be any of the following: "RSM US, LLP provided that RSM US, LLP is an independent accounting firm that has not been engaged by either party in the last five (5) years, or . . . such other nationally recognized, certified public accounting firm selected by the Parties."  APA at 7.
[86] *See Specialty Dx Holdings, LLC*, 2020 WL 5088077, at *7 ("An independent accounting firm is well-placed to resolve a dispute about differing calculations of revenue, which will then be used to calculate an earn-out statement.").
[87] *See* Seller's Disagreement Notice.
[88] Pls.' Combined Br. at 10.
[89] 166 A.3d 912 (Del. 2017).
[90] *Id.* at 925.
[91] *Id.*

the relief sought was outside of the scope of the independent accountant contractual charge.[92]

That is not the case here. There is no dispute that the current disagreements are disagreements regarding anything other than the Earnout Provision—a provision that is explicitly to be resolved by the Resolution Accountants.

Belknap next relies on *Penton Business Media Holding, LLC v. Informa PLC,*[93] In *Penton Business Media Holding, LLC*, the Court of Chancery held that the independent accounting firm could not consider extrinsic evidence in evaluating the parties' dispute.[94] The plaintiff sought a declaration "that the accountant has authority to determine what information it can consider."[95] The Court of Chancery found that "[a]lthough parties could give an expert the authority to interpret a contract, here they did not. Instead, the court must interpret the contract to determine what the accountant can consider."[96] The Court of Chancery held that "[i]n each case it is necessary to examine the contract itself in order to decide what the parties intended should be a matter for the exclusive decision of the expert."[97]

This case is distinguishable from *Penton Business Media Holding, LLC*. The Resolution Accountants here are bound to:

> (i) limit the scope of their review to only the unresolved Disagreements, (ii) make their determination based solely on written submissions by the Buyer and the Seller Parties which are in accordance with the guidelines and procedures set forth in this Agreement (i.e., not on the basis of an independent review) and (iii) include in their final report the Resolution Accountants' reasoning in reaching their determinations.[98]

---

[92] *Id.* at 926.
[93] 252 A.3d 445 (Del. Ch. 2018).
[94] *Id.* at 447.
[95] *Id.*
[96] *Id.* at 448.
[97] *Id.* at 465.
[98] APA § 3.4 (c).

The Disagreements are clear. The Disagreements challenge the classifications given to the Avkin Sale, Xometry Sale, and the "Booked Revenue."[99] Belknap and Midwest can submit the Disagreements directly to the Resolution Accountants for a determination on whether those amounts were properly or improperly categorized by Midwest. APA Sections 3.3 and 3.4 establish the intent to have Disagreements submitted to the Resolution Accountants.[100]

Last, Belknap relies on *AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc.*,[101] in which the Court of Chancery held that the provision at issue only "triggered in the narrow circumstance of the parties hav[ing] a disagreement over the contents of the final Closing Statement generated at the end of the Review Process."[102] The Court of Chancery found that "the Referee is to have a limited role: to apply her industry-specific knowledge to answer a technical, industry-specific question that are properly teed up for the Referee through the parties' own Review Process."[103] In *AQSR India Private, Ltd.*, the Court of Chancery held that the parties did not follow the Review Process and, as such, the Court of Chancery had to determine what the parties' respective rights were in light of the breakdown in the process.[104]

*AQSR India Private, Ltd.* is also distinguishable. Belknap and Midwest complied with the APA's Earnout Provisions, up until it was time to submit the Disagreements to the Resolution Accountants. There is nothing for the Court to determine that is not stated in the Earnout Provision or was not teed up in the Disagreement Notice for the Resolution Accountants to decide.

---

[99] *See* Seller's Disagreement Notice.
[100] This can also be seen by the jurisdiction and venue clause of the APA. Section 8.9 states, "[e]xcept for disputes which will be resolved by the Resolution Accountant as set forth in Sections 3.3 and 3.4, the Parties irrevocable consent and submit to the exclusive jurisdiction of the courts of the Delaware Court of Chancery (or, [] any state or federal court within the State of Delaware)." APA § 8.9.
[101] 2009 WL 1707910 (Del. Ch. June 16, 2009).
[102] *Id.* at *7.
[103] *Id.*
[104] *Id.* at *8.

15

The Court finds that there is no genuine dispute that the APA is an enforceable contract that contains a Resolution Accountants Provision which governs the Disagreements. The Court finds that the instant suit concerns Disagreements over the Earnout Calculations and as such the parties are bound, by contract, to submit those disagreements to the Resolution Accountants.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS** Midwest's Motion for Summary Judgment and **DENIES** Belknap's Motion for Judgment on the Pleadings.

**IT IS SO ORDERED.**

October 8, 2024
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc: File&ServeXpress